Pioneer Industries, Inc.,

       Plaintiff/Counterdefendant,

v.                                 Civil No. 07-4421 (JNE/JJK)
                                 ORDER

Hartford Fire Insurance Company,

       Defendant/Counterclaimant.

---

Joseph F. Lulic, Esq., Hanson Lulic & Krall, LLC, appeared for Plaintiff/Counterdefendant
Pioneer Industries, Inc.

John J. McDonald, Jr., Esq., Meagher & Geer, P.L.L.P., appeared for
Defendant/Counterclaimant Hartford Fire Insurance Company.

---

Clinton Harlander died in 2006. After his death, his employer, Pioneer Industries, Inc.,

discovered that he had stolen more than $500,000 from it and two related entities between 1995

and 2006. Pioneer Industries made a claim on a commercial crime insurance policy issued by

Hartford Fire Insurance Company (Hartford), only to discover that Harlander—who had

unlimited authority with respect to Pioneer Industries' insurance applications—had lied about the

company's accounting safeguards in those applications. Hartford now seeks to avoid paying the

claim on Harlander's theft, and also seeks the return of $500,000 it paid nine years ago on a loss

resulting from theft not caused by Harlander. As explained below, this Order permits Hartford to

avoid paying the claim caused by Harlander's theft, but does not require the return of the

$500,000 Hartford paid in 2000.

After Hartford refused to pay the claim caused by Harlander's theft, Pioneer Industries

brought this action against Hartford in state court alleging breach of contract. Hartford removed

the action to this Court on the basis of diversity jurisdiction and counterclaimed for a declaration

that it is entitled to rescind certain commercial crime insurance policies issued by Hartford to

Pioneer Industries and several entities related to Pioneer Industries. Hartford also

counterclaimed for the return of the $500,000 payment it made to Pioneer Industries in 2000.

The case is before the Court on Hartford's motion for summary judgment dismissing the

Complaint, a declaration that Hartford is entitled to rescind the commercial crime insurance

policies, a declaration that the commercial crime insurance policies are void *ab initio*, and entry

of judgment against Pioneer Industries and in favor of Hartford on Hartford's counterclaim,

including the return of the $500,000 Hartford paid in 2000. For the reasons set forth below, the

Court grants in part and denies in part Hartford's motion.

## I.     BACKGROUND

Pioneer Industries is a paper recycling company owned by James Chafoulias. Chafoulias

also owns four companies related to Pioneer Industries, including the Batliner Paper Stock

Company (Batliner). The Court refers to Pioneer Industries and its related entities collectively as

"Pioneer." Chafoulias has been Pioneer's chief executive officer for the past 35 years. Clinton

Harlander served as Pioneer's chief financial officer (CFO) from 1985 until his death in 2006.

Chafoulias testified during his deposition that Harlander had unlimited authority to complete

insurance applications for Pioneer.

In 1987, Pioneer purchased a commercial crime insurance policy from Hartford through

Lee F. Murphy, Inc., an independent insurance agency.[1] Pioneer submitted an application in

connection with the policy. Robert Murphy, an agent at Lee F. Murphy, testified that he met

with Harlander and filled out the application as Harlander provided the answers to the

application questions. Harlander signed the application in the capacity of the secretary of

---

[1]     A commercial crime insurance policy covers losses resulting from employee theft.

Pioneer. The 1987 application included questions relating to Pioneer's audit procedures. In response to those questions, Harlander indicated that an outside certified public accountant (CPA) audited Pioneer's cash and accounts annually and that all premises were audited. The application also contained questions about the presence of internal controls limiting an individual's authority over Pioneer's bank accounts. In response to the questions relating to internal controls, Harlander indicated that bank accounts were reconciled by a person without authority to deposit to or withdraw from the accounts and that countersignatures were required on checks.

Hartford then issued a commercial crime insurance policy to Pioneer having a policy number of 41 BCP EC 6983 (6983 Policy).[2] The 6983 Policy stated that the policy period was "from 12:01 a.m. . . . to 12:01 a.m. on the effective date of the cancelation or termination of this Policy." The 6983 Policy included a "Cancelation of Policy" provision stating that the "effective date of cancelation stated in the notice [of cancelation] shall become the end of the Policy Period."

On January 11, 1990, Pioneer submitted a new application to Hartford in connection with a commercial crime insurance policy to become effective on April 1, 1990. The 1990 application indicated that an independent CPA, a public accountant, or an equivalent audited Pioneer's accounts on an annual basis; that all locations were audited; that bank accounts were reconciled by someone not authorized to deposit to or withdraw from the accounts; and that countersignatures on checks were required. Harlander signed the application on behalf of Pioneer. Hartford then issued a commercial crime insurance policy to Pioneer having a policy

---

[2]     Hartford cites Exhibit 5 to the Affidavit of John J. McDonald, Jr., when referring to the 6983 Policy. Exhibit 5 appears to be a blank commercial crime insurance policy form. Pioneer has not argued that Exhibit 5 is not representative of the 6983 Policy.

number of 41 DDD EL1130 (1130 Policy). The 1130 Policy stated that the policy period was "from April 1, 1990 until cancelled" and noted that acceptance of the 1130 Policy constituted "notice cancel[l]ing prior policies or bonds numbered: BCP EC6983 effective 4/1/87 issued by [Hartford]."

Chafoulias acquired Batliner in 1994. On December 16, 1994, Lee F. Murphy faxed Hartford commercial crime insurance policy applications filled out on behalf of Batliner and another of the Pioneer entities. Wayne Bogatzki, an agent at Lee F. Murphy, testified that he would have contacted Harlander to obtain the information for the application. According to Murphy, he would have referred to an "accord" crime policy application when asking the questions whose answers were recorded on the 1994 application. The 1994 application indicates that a CPA audited Batliner's accounts annually, bank accounts were reconciled by someone not authorized to make deposits or withdrawals, and countersignatures on checks were required.

In 2000, Hartford issued to Pioneer a commercial crime insurance policy having a policy number of 41BDDAH7179 (7179 Policy).[3] The 7179 Policy stated that the Policy Period was from "April 1, 2000 until cancelled" and that "[b]y acceptance of this Policy you give us notice cancelling prior policies or bonds numbered: DDD EL1130 the cancellations to be effective at the time this policy becomes effective." A "Minnesota Changes" endorsement replaced the Cancellation General Condition with a provision stating: "Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date." This endorsement required Hartford to give Pioneer 60 days' written notice if Hartford decided not to renew the 7179 Policy.

---

[3] The record contains no evidence indicating that Pioneer submitted an application in 2000.

The Minnesota Changes endorsement also replaced the "Concealment, Misrepresentation or Fraud" General Condition with a provision stating:

This insurance is void in any case of:

1.      Material misrepresentation or omission; or

2.      Fraud

by you or with your knowledge in:

1.      Obtaining this insurance; or

2.      Pursuing a claim under the Policy.

On August 18, 2000, Pioneer submitted a proof of loss to Hartford making a claim under the 7179 Policy for inventory theft at a Batliner facility in the amount of $942,094.83.  The limit on the 7179 Policy was $500,000.  Hartford paid $114,640.36 on the Batliner claim on November 8, 2000, and the remaining $385,359.64 on December 6, 2000.

On January 24, 2003, Hartford sent a "Notice of Nonrenewal" to Pioneer.  In that notice, Hartford stated that it was exercising its right to non-renew the 7179 Policy in accordance with the Nonrenewal provision of the 7179 Policy, with the termination to be effective on April 1, 2003.  Hartford further stated:

> Although Hartford is electing to non-renew the above policy, upon receipt and review of all required underwriting information, the Underwriter, at its sole discretion, may offer to replace the above[-]referenced policy with certain changes in the terms and conditions.  Changes may include but are not limited to an increase in premium, an increase in deductibles, a reduction in limits, the addition of policy conditions, and/or an elimination of certain types of coverage.

On February 27, 2003, Lee F. Murphy faxed a commercial crime insurance policy application to Pioneer with a cover sheet stating that the 7179 Policy "expires 4/1/03" and that Hartford "has requested that this application be completed for the Renewal."  Pioneer returned the completed 2003 application to Lee F. Murphy, and Lee F. Murphy faxed it to Hartford on

March 20, 2003.  The 2003 application indicated that financial statements were audited annually by an independent CPA; that all subsidiaries, locations, and similarly controlled and operated companies were included in the audit; that the auditing firm regularly reviewed the system of internal controls and furnished written reports to Pioneer; that Pioneer's accounting was decentralized; that at least two signatures were required on checks; and that employees who reconciled monthly bank statements did not sign checks, handle bank deposits, or have access to check signing machines or signature plates.  The 2003 application also stated that internal control systems were "designed so that no employee can control a process from beginning to end (e.g. request a check, approve a voucher and sign the check)" and that all incoming checks were stamped "For Deposit Only" immediately upon receipt.  Harlander signed the 2003 application.

On March 27, 2003, Deborah Nelson at Hartford requested via fax that Lee F. Murphy obtain additional information about Pioneer relating to the 2003 application.  Specifically, Hartford sought confirmation that accounting controls were the same in all locations.  Lee F. Murphy returned the fax to Hartford with the word "yes" written next to that request.  Murphy testified during his deposition that he would have obtained the answer to that inquiry from Pioneer.

On March 2, 2004, Pioneer submitted a "renewal application" for the 7179 Policy. Pioneer indicated in the 2004 application that "Internal Controls per [Pioneer's] most recently completed application" were unchanged.  Harlander signed the 2004 application.

Harlander died on May 28, 2006.  On August 22, 2006, Pioneer submitted a proof of loss to Hartford making a claim under the 7179 Policy for Harlander's misappropriation of $549,859.26 from Pioneer Industries and two of its related companies between 1995 and 2006. Pioneer attached a letter to the proof of loss detailing the losses and how they occurred.  Pioneer

stated in the letter that Harlander had signature authority over and reconciled Pioneer Industries' savings account and several of Pioneer Industries' checking accounts. Harlander wrote checks that were payable to himself and others for his benefit (for his personal expenses) out of the checking accounts. Harlander also withdrew cash for himself from the savings account. In addition, Harlander endorsed checks written by one Pioneer entity to another for deposit into his personal account or for deposit into the Pioneer Industries savings account. If the check was deposited to the Pioneer Industries savings account, Harlander took the funds as cash. Harlander also used Pioneer Industries' credit card for personal expenses, insured his personal automobile under Pioneer Industries' automobile insurance policy, paid himself for unused vacation despite Pioneer Industries' "use it or lose it" vacation policy, and gave himself unauthorized raises.[4]

On November 30, 2006, Hartford notified Pioneer by letter that Hartford was rescinding the 7179 Policy on the ground that Pioneer made material misrepresentations that increased Hartford's risk of loss in the 1987, 1990, 2003, and 2004 applications.[5] Hartford stated that it would return all premiums it had received from Pioneer and demanded that Pioneer return all claims Hartford had paid under the 7179 Policy, including the Batliner claim. In a letter dated January 30, 2007, Hartford indicated that the premiums paid were as follows: $2,334 under the 6983 Policy, $12,796 under the 1130 Policy, and $14,544 under the 7179 Policy, in a total amount of $29,684. Hartford enclosed a check for $29,684 made out to Pioneer Industries.

Pioneer refused the returned premium and filed suit against Hartford in state court alleging breach of contract based on Hartford's denial of coverage. Hartford removed to this

---

[4]     The parties dispute whether all of these losses are covered under the 7179 Policy. Based on the Court's determination that Hartford is entitled to rescind the 7179 Policy and that the 7179 Policy is void *ab initio*, the Court does not reach this issue.

[5]     The letter did not mention the 1994 applications for Batliner and the other Pioneer entity.

Court and counterclaimed for a declaration that it is entitled to rescind the 6983, 1130, and 7179

Policies (collectively, Policies), a declaration that the Policies are void *ab initio*, and judgment in

favor of Hartford and against Pioneer Industries in the amount of $470,316 (the $500,000

Hartford paid on the Batliner claim less the $29,684 in premiums paid by Pioneer on the

Policies).

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "bears the

initial responsibility of informing the district court of the basis for its motion," and must identify

"those portions of [the record] which it believes demonstrate the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its

burden, the nonmovant must respond by submitting evidentiary materials that "set out specific

facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining whether summary judgment is

appropriate, a court must look at the record and any inferences to be drawn from it in the light

most favorable to the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.    Rescission of the Policies

Hartford contends that it is entitled to rescind the Policies under Minn. Stat. § 60A.08,

subd. 9 (2008), which provides:

> No oral or written misrepresentation made by the assured, or in the assured's
> behalf, in the negotiation of insurance, shall be deemed material, or defeat or
> avoid the policy, or prevent its attaching, unless made with intent to deceive and
> defraud, or unless the matter misrepresented increases the risk of loss.

Under this statute, an insurer may rescind a policy when an insured's misrepresentation increased the risk of loss. *In re Silicone Implant Ins. Coverage Litig.*, 652 N.W.2d 46, 77 (Minn. Ct. App. 2002), *rev'd on other grounds*, 667 N.W.2d 405 (Minn. 2003). If the misrepresentation increased the risk of loss, "the policy is avoided regardless of the intent with which it was made."[6] *Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917, 924 n.6 (Minn. 1983). The burden of proving the misrepresentation increased the risk of loss is on the insurer. *Quintana v. Allstate Ins. Co.*, 378 N.W.2d 40, 45 (Minn. Ct. App. 1985).

### 1. Applicability of Minn. Stat. § 60A.08, subd. 9

Pioneer contends that Minn. Stat. § 60A.08, subd. 9, is inapplicable here because the statute requires misrepresentations in connection with the "negotiation" of insurance, and there is no evidence of any negotiations in this case. Pioneer relies on Minn. Stat. § 60A.08, subd. 11, which states:

> No misrepresentation or omission made in an application or negotiation for any policy providing directors and officers liability coverage for directors or officers of a corporation shall defeat or avoid coverage or prevent the policy from attaching for a director or officer unless the director or officer has signed the application and has actual knowledge of the facts misrepresented or omitted.

Pioneer claims that the language "application or negotiation" demonstrates a legislative intent to distinguish an application from a negotiation.

Pioneer cites no authority distinguishing an "application" from a "negotiation" in the context of Minn. Stat. § 60A.08, subd. 9. On the contrary, Minnesota courts have applied this statute and its predecessor, Minn. Stat. § 60.85 (repealed 1967), to misrepresentations made in

---

[6] Pioneer contends that Hartford must show that Pioneer knew the representations were false and intended to conceal the information from Hartford in order to rescind the Policies under Minn. Stat. § 60A.08, subd. 9. The Court rejects this argument. *See Sec. Mut. Cas. Co. v. Affiliated FM Ins. Co.*, 471 F.2d 238, 243 (8th Cir. 1972) ("In an unbroken line of cases, the Supreme Court of Minnesota has construed its statute [as] 'If a material misrepresentation increases the risk of loss, the policy is avoided, regardless of the intent with which it is made.'").

applications without regard to whether or not a separate "negotiation" took place.  *E.g.*,

*Preferred Risk Mut. Ins. Co. v. Anderson*, 152 N.W.2d 476, 482 (Minn. 1967) (deciding whether

statement that defendant owned vehicle in letter accompanying his application for insurance

increased the risk of loss); *Nielsen v. Mut. Serv. Cas. Ins. Co.*, 67 N.W.2d 457, 458-59 (Minn.

1954) (deciding whether misrepresentations in application for automobile insurance voided the

policy); *In re Silicone Implant Ins. Coverage Litig.*, 652 N.W.2d at 78 ("We recognize that, had

the jury found that 3M misrepresented material facts in connection with its insurance

applications . . . ."); *Quintana*, 378 N.W.2d at 45 (deciding whether rescission was permissible

based on misrepresentation of purchase price of mobile home in "application for insurance");

*Proprietors Ins. Co. v. Nw. Nat'l Bank*, 374 N.W.2d 772, 772-73, 777 (Minn. Ct. App. 1985)

(deciding whether misrepresentation of the number of pilot hours logged by each pilot who

would fly the insured plane in the application for insurance permitted rescission).  In the absence

of any authority suggesting that Minnesota courts distinguish an application for insurance from a

negotiation for insurance, the Court declines to impose such a distinction.  Minnesota Statutes

§ 60A.08, subd. 9, applies to the statements made in the 1987, 1990, 2003, and 2004

applications.

### 2.    Misrepresentations by Pioneer

The Court turns to whether Pioneer made misrepresentations in connection with the 1987,

1990, 2003, and 2004 applications.  Those applications contained representations that a CPA or

an equivalent performed annual audits of Pioneer's accounts, that Pioneer did not permit

employees who reconciled bank accounts to make deposits to or withdrawals from the accounts,

and that Pioneer required countersignatures on checks.  The 2003 application expressly

represented that Pioneer had internal controls preventing an employee from controlling the check process from beginning to end.

Hartford identifies several pieces of evidence establishing that those representations were false. First, Chafoulias testified during his deposition that it was his understanding that the representations made in those applications were inaccurate. Second, Pioneer admitted in the letter accompanying its August 22 proof of loss that Harlander "had signature authority over and reconciled" Pioneer Industries' checking accounts and savings account. Third, Hartford submits several of Pioneer Industries' admissions in its responses to Hartford's Requests for Admissions. Pioneer admitted that as of the dates of the 1987 and 1990 applications, "some or all" of Pioneer's monthly bank statements and accounts were reconciled by someone authorized to deposit to or withdraw from the accounts. Pioneer also admitted that as of the date of the 2003 application, "some or all" of Pioneer's monthly bank statements were reconciled by someone authorized to sign checks, authorized to handle bank deposits, or that had access to check signing machines or signature plates. Pioneer admitted that as of the dates of the 1987, 1990, and 2003 applications, "some or all" of Pioneer's accounts did not require countersignatures on checks. Fourth, Thomas Harrison, who replaced Harlander as Pioneer's CFO, admitted during his deposition that some of the Pioneer entities did not require dual signatures on checks, permitted employees who reconciled bank accounts to sign checks and handle bank deposits and withdrawals, did not immediately stamp "For Deposit Only" on checks, and did not have internal controls in place to prevent an employee from controlling the check process from beginning to

end.  Harrison testified that external audits performed by a CPA or an equivalent did not take place during the time in question at any of the Pioneer entities.[7]

In short, Pioneer does not dispute that the representations regarding internal controls and audit procedures made in the 1987, 1990, 2003, and 2004 applications were false with respect to some of the Pioneer entities.  Instead, asserting that the questions in the applications were ambiguous because they did not permit an applicant to answer "yes" for one entity and "no" for another, Pioneer contends that the statements were not misrepresentations because some of the insured entities did have internal controls in place.  The Court therefore considers whether the questions in the applications were ambiguous.

"Whether the language of an insurance policy is ambiguous is a question of law." *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979).  "If the language of the policy is reasonably subject to more than one interpretation, there is ambiguity. If it is not reasonably subject to more than one interpretation, there is no ambiguity." *Id.* (citation omitted).  "A court may not 'read ambiguity into the plain language of a policy in order to provide coverage.'" *Id.*  Here, the 1987 and 1990 applications asked if bank accounts were "reconciled by someone not authorized to deposit or withdraw" from the accounts.  This language is not reasonably subject to more than one interpretation—if any Pioneer employee who reconciled monthly statements was authorized to make deposits to or withdrawals from the account, the correct answer would be "no."  The 2003 application asked if "employees who reconcile monthly bank statements also . . . sign checks," "handle bank deposits," or "[h]ave access to check signing machines or signature plates."  If any Pioneer employee who reconciled

---

[7]     Harrison testified that an external CPA performed "reviews" of Pioneer's accounts, but admitted that a review is less encompassing in scope than an audit and does not include the external assessment of a company's system of internal controls that would be part of an audit.

monthly bank statements performed any of those three activities, the correct answer would be "yes." The 2003 application also asked "are internal control systems designed so that no employee can control a process from beginning to end?" Again, if any employee could control the check process from beginning to end, the correct answer to this question clearly would be "no."

In addition, the 1987 and 1990 applications asked not only if audits were made by a CPA or an equivalent, but also whether all premises or locations were audited. The 2003 application asked if Pioneer's financial statements were audited annually by an independent CPA and if "all subsidiaries and locations, or similarly controlled and operated companies, [were] included in the audit?" There is nothing ambiguous about those questions—if some but not all of Pioneer's locations were subject to audits by an external CPA, Pioneer should have answered "no." The 2004 application asked whether "Internal Controls per [Pioneer's] most recently completed application" had changed. Pioneer identifies no ambiguity in this question. The Court concludes that the questions in the 1987, 1990, 2003, and 2004 applications are not ambiguous.

Pioneer next contends that it was Harlander who made the misrepresentations, not Pioneer, because the 7179 Policy distinguishes the named insured from employees of the named insured and Harlander was an employee, not a named insured. This argument ignores the well-established principle that an entity such as Pioneer can act only through its agents or employees. *See Thomas Oil, Inc. v. Onsgaard*, 215 N.W.2d 793, 796 (1974) (recognizing "that a corporation can act only through its agents and employees").

Pioneer also argues that Harlander's misrepresentations were *ultra vires* and cannot be attributed to Pioneer because Harlander did not sign all of the applications in his corporate capacity and was not authorized to make misrepresentations in the applications. Chafoulias

admitted that Harlander had unlimited authority to make insurance applications on behalf of Pioneer. Harlander's misrepresentations are attributable to Pioneer. *See Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967) ("[A] principal is liable for the deceit of his agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.").

In addition, "[u]nder Minnesota law, it is well established 'that a principal cannot accept the benefits of the agent's unauthorized conduct and then deny liability based on the fact that the conduct was unauthorized.'" *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1433 (8th Cir. 1995) (quoting *Centennial Ins. Co. v. Zylberberg*, 422 N.W.2d 18, 21 (Minn. Ct. App. 1988)). Even if Harlander had exceeded his authority in making the misrepresentations, Pioneer ratified Harlander's conduct by making claims on the 7179 Policy and thereby seeking the benefit of Harlander's misrepresentations, without which, for the reasons explained below, Pioneer would not have been able to obtain the 7179 Policy. Pioneer has not shown a genuine issue of material fact as to whether it made misrepresentations about its internal controls and audit procedures in the 1987, 1990, 2003, and 2004 applications.

### 3. Materiality and Risk of Loss

The Court turns to whether the misrepresentations were material and increased the risk of loss. "[F]or purposes of determining materiality . . . the concept 'risk of loss' refers to the likelihood of future liability on the insurance company for loss." *Ins. Co. of Penn. v. Hoffman*, 814 F. Supp. 782, 786 (D. Minn. 1993) (quoting *Anderson*, 152 N.W.2d at 483); *see In re Silicone Implant Ins. Coverage Litig.*, 652 N.W.2d at 77 ("The risk of loss is . . . increased when there is a greater likelihood that the insurer will be liable in the future than there would have been if the facts were as the insured stated them to be.").

Hartford offers the expert report of Richard Thomas as evidence that there was a greater likelihood that Hartford would be liable in the future than there would have been if Pioneer had possessed the internal controls and audit procedures it claimed to have. Thomas worked for the St. Paul Fire & Marine Insurance Company for 32 years, where his experiences included 25 years in underwriting and management, as well as the development of crime insurance products, underwriting guidelines, and training programs. He explained that the primary purpose of the underwriting application for insurance is to allow the insurer to determine whether to issue the policy. According to Thomas, questions about internal controls and audit procedures act as the "primary safeguard against employee dishonesty . . . because the segregation of duties (preventing one individual from controlling a transaction from its beginning to end) and the checks and balances of one person reviewing another's work" significantly deter internal crime. They also permit the earlier discovery of honest mistakes and dishonest acts. He explained that an annual audit performed by an independent CPA, unlike a review, would provide the insured's management with a management letter, which is an independent professional evaluation of the insured's internal controls. According to Thomas, a management letter is used to identify material weaknesses and permits management to make corrections. Thomas concluded that the misrepresentations in the applications were material and represented a "very substantial increase to the risk of loss."

In addition, Nan Chen, a bond underwriter at Hartford who worked until 1999 in the "Bond Center" that underwrote Pioneer's application, stated that the presence of accounting and internal controls is essential to analyzing the potential risk that Hartford might face if it issued a commercial crime insurance policy. Joelle LaPierre, a member of the Bond Center's "Leadership Team," stated in an affidavit that the presence of internal controls is essential to

analyzing the potential risk to Hartford if it chooses to issue a commercial crime insurance policy.[8]  Chen and LaPierre both stated that Hartford will not underwrite a fidelity risk, such as a commercial crime insurance policy, for a business that does not have internal controls in place. They also stated that Hartford would not have accepted the risk of insuring Pioneer had accurate representations been made on the applications regarding internal controls and audit procedures. Finally, Harrison admitted during his deposition that segregating those who reconciled accounts from those with signatory authority decreased the risk of losses such as those caused by Harlander and that Harlander's ability to control a transaction from beginning to end increased the risk of sustaining losses such as those caused by Harlander.

Relying on the expert report of Andrew Whitman, Pioneer contends that Hartford cannot show the misrepresentations increased the risk of loss.[9]  Whitman is a Professor of Insurance at the University of Minnesota Carlson School of Management and acts as an insurance consultant to private and public organizations.  Whitman's experience with commercial crime insurance policies appears limited.  He testified during his deposition that none of his publications were focused on commercial crime coverage, although a "few of them dealt with [commercial crime coverage] in part."  Whitman also testified that he had no role in developing policies or practices

---

[8]      Pioneer asserts that Hartford did not disclose LaPierre during discovery.  This assertion is incorrect.  Pioneer disclosed LaPierre in its third set of disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure.

[9]      Citing *Foremost Guaranty Corp. v. Meritor Savings Bank*, 910 F.2d 118 (4th Cir. 1990), Pioneer argues that Hartford cannot rescind because knowledge of the misrepresentations could have been obtained by reasonable inquiry.  In *Foremost*, the insurers could not rescind "[b]ecause both insurers had in their possession the written memoranda contradicting the oral representations."  910 F.2d at 127.  Pioneer has identified no authority imposing a duty on an insurer to verify the accuracy of representations in an application in the absence of facts suggesting the representations are false, nor has Pioneer identified any evidence indicating that Hartford had any such facts in its possession.  *Foremost* is readily distinguishable.

associated with commercial crime coverage in his role as a director for Minnesota's State Risk Management Department, which he described as an "in-house insurance company for the State and its agencies." Whitman could not remember being retained to opine on commercial crime insurance policies prior to this case.

Whitman stated in his expert report that the misrepresentations were not material because the policies covered a broad spectrum of risks and the controls over the accounts managed by Harlander were just one aspect of that risk.[10] Although Whitman describes the overall risk to Hartford as "much broader" than the risk created by the lack of internal controls or directly attributable to Harlander, he concluded only that the misrepresentations did not "substantially increase the risk." Minnesota Statutes § 60A.08, subd. 9, does not require that a misrepresentation "substantially" increase the risk of loss to permit rescission. Moreover, Whitman's opinion that Hartford would have excluded the risk associated with a deficiency in internal controls or required the insured to implement the missing internal control is evidence that the risk of loss is increased without that internal control. Whitman's expert report does not create a genuine issue of material fact as to whether Pioneer's misrepresentations in the 1987, 1990, 2003, and 2004 applications were material or whether they increased the risk of loss to Hartford.

Pioneer suggests that the policies may not be rescinded because Hartford did not require an application in 2000 and has not required an application since 2004. "The general rule appears to be that in the absence of a new application[,] renewal of a . . . policy is made on the

_____

[10]     Pioneer also contends that the absence of questions about internal controls in the 2004 application is another indication that questions related to internal controls are not material. This assertion is without basis in fact. The 2004 application specifically asked if "Internal Controls per your most recently completed application" had changed, and the 2003 application contained several questions about internal controls.

assumption that the facts disclosed in the original application are true." *Batka v. Liberty Mut. Fire Ins. Co.*, 704 F.2d 684, 687 (3d Cir. 1983); *see Borden v. Paul Revere Ins. Co.*, 935 F.2d 370, 378 (1st Cir. 1991) (rejecting argument that insurer could not have relied on misrepresentations made in an application for previous policy); 1 Allan D. Windt, *Insurance Claims and Disputes* § 2:28 n.3 (5th ed. 2008) ("[O]f course . . . in the absence of a new application, the renewal is made on the assumption that the facts disclosed in the original application are true. As a result, the insurer can rescind the renewal policy if the original application was fraudulent."). Hartford was entitled to rely on representations made by Pioneer in earlier applications when renewing or issuing new policies, and Pioneer identifies no evidence suggesting that Hartford did not do so.

Pioneer contends, citing *Howard v. Aid Ass'n for Lutherans*, 272 N.W.2d 910 (Minn. 1978), that Hartford is not entitled to rescission unless it can show that it would not have issued the Policies had it known the truth about Pioneer's internal controls and audit procedures. *Howard* addresses whether a misrepresentation of a required disclosure in an application for life insurance voided the policy without regard to whether the facts misrepresented ultimately related to the insured's cause of death. 272 N.W.2d at 912. The portion of *Howard* on which Pioneer relies is a quotation from a Maryland case stating:

> [T]he question should not be whether or not the applicant was afflicted with a particular disease, but whether at the time of application "facts of which the insured had full knowledge were concealed from the insurer . . . and were of such probative force as in all reasonable probability, if brought to the knowledge of the company, would have precluded the issuance of the policy."

*Id.* at 913 (quoting *Hofmann v. John Hancock Mut. Life Ins. Co.*, 400 F. Supp. 827, 834 (D. Md. 1975)). However, the *Howard* court did not require the insurer to show that it would not have issued the policy, instead stating "it is our view that the focal examination must be whether an omission or misrepresentation substantially affects or impairs an insurer's ability to make a

reasonable decision to assume the risk of coverage."  272 N.W.2d at 913; *see id.* ("In application of this standard, we conclude that the disclosure of the facts concealed by the decedent would have, with reasonable probability, substantially influenced the insurer's decision to provide coverage and, as such, plaintiff is precluded from recovery under the policy.").  In short, the Court is not convinced that Minnesota law requires Hartford to show that it would not have issued the Policies had it known the truth about Pioneer's internal controls and audit procedures.

Even if Minnesota law imposed such a requirement on Hartford, Pioneer has not shown a genuine issue of material fact as to whether Hartford would have issued the Policies had it known the truth.  Thomas stated in his expert report that had Pioneer provided true and accurate information about its internal controls and audit procedures, "Hartford would not have issued a fidelity policy" to Pioneer.  Chen and LaPierre stated in their affidavits that Hartford would not have accepted the risk of insuring Pioneer had accurate representations been made in the applications regarding internal controls and audit procedures and that Hartford will not underwrite a fidelity risk for a business that does not have internal controls in place.

Pioneer asserts that Hartford's underwriting manual and guidelines are evidence that Hartford would have "treated the risk" through exclusions and pricing rather than declining the risk.  Pioneer also submits Nelson's deposition testimony that she would have considered excluding coverage for specific individuals or entities lacking internal controls and Whitman's opinion that Hartford would have "treated the risk" had it known the truth.  In essence, Pioneer argues that it could make misrepresentations about internal controls and audit procedures that increased the risk of loss to Hartford, yet avoid rescission because Hartford could have excluded coverage for those losses had it known the truth about Pioneer's internal controls and audit procedures.  This argument makes no sense.  Hartford's theoretical willingness to issue some

policy excluding, for example, coverage of Harlander's acts, is not evidence that Hartford would have issued the Policies had it known the truth about Pioneer's internal controls and audit procedures. Pioneer has not shown a genuine issue of material fact as to whether Hartford would have issued the Policies had it known the truth about Pioneer's internal controls and audit procedures.[11]

Finally, Pioneer suggests that Hartford must cover losses caused by Harlander that were unrelated to the internal controls and audit procedures questions. This argument fails because the materiality of a misrepresentation is not measured "by the degree of causal connection between the false statement and the loss protected by the policy." *See Howard*, 272 N.W.2d at 912 (defining materiality in the context of rescinding life insurance policy under Minn. Stat. § 61A.11); *Useldinger v. Old Republic Life Ins. Co.*, 377 N.W.2d 32, 36 (Minn. Ct. App. 1985) ("This is not to say that the causal connection between misstated facts and ultimate cause of death is controlling. Clearly, under *Howard*, it is not."). This argument also misapprehends the nature of rescission, which "as a general rule must be exercised *in toto* and is applied to the contract in its entirety." *Merickel v. Erickson Stores Corp.*, 95 N.W.2d 303, 306 (Minn. 1959). If Hartford is entitled to rescind the 7179 Policy, Hartford is not required to cover any of the losses for which Pioneer sought coverage in its 2006 claim.

---

[11]    Hartford also contends that Pioneer's misrepresentations increased the risk of loss because they impaired Hartford's ability to make a reasonable decision to assume the risk of coverage initially. "A misrepresentation increases the risk of loss when it impairs the insurer's ability to make a reasonable decision initially to assume the risk of coverage." *In re Silicone Implant Ins. Coverage Litig.*, 652 N.W.2d at 77. The evidence submitted by Hartford indicating that it would not have issued the Policies had Pioneer accurately represented its internal controls and audit procedures similarly establishes that Pioneer's misrepresentations impaired Hartford's ability to make a reasonable decision to assume the risk of covering Pioneer. Pioneer identifies no evidence that creates a genuine issue of material fact on this issue.

Pioneer has not raised a genuine issue of material fact as to whether Hartford is entitled to rescind the 7179 Policy. The Court grants Hartford summary judgment on its claim seeking a declaration that it is entitled to rescind the 7179 Policy and that the 7179 Policy is void *ab initio*. Hartford was entitled to deny coverage for Pioneer's claim for losses resulting from Harlander's theft. The Court dismisses Pioneer's claim for breach of contract.

**B.     Batliner Claim**

Hartford contends that because rescission of the 7179 Policy was proper, Pioneer must return the $500,000 Hartford paid to Pioneer under the 7179 Policy in 2000 for the Batliner claim. Pioneer responds that each policy year of the 7179 Policy is a separate policy and that Pioneer is therefore not required to return the $500,000 because it was paid in 2000 and Hartford rescinded in 2006.

"Rescission is the unmaking of a contract, which not only terminates the contract but abrogates it and undoes it from the beginning." *Johnny's, Inc. v. Njaka*, 450 N.W.2d 166, 168 (Minn. Ct. App. 1990) (citation omitted). Rescission puts the parties in the same position they would have been had the contract never existed. *Id.* at 168. Hartford would not be entitled to the return of the $500,000 paid on the Batliner claim based on its 2006 rescission unless, at a minimum, the 7179 Policy was a continuing policy from 2000 to 2006. The Court therefore considers whether the 7179 Policy was continuing.

"Whether the payment of a renewal premium results in the extension or continuation of the original policy or the formation of a new and independent contract depends primarily on the intention of the parties as ascertained from the policy itself." *AMCO Ins. Co. v. Lang*, 420 N.W.2d 895, 898 (Minn. 1988). Here, the Declarations page for the 7179 Policy states that the policy period is "from April 1, 2000 until cancelled." The Cancellation endorsement provides

that "[n]otice of cancellation will state the effective date of cancellation" and the "Policy Period will end on that date." This language indicates that the policy period extended from April 1, 2000, until the effective date of cancellation of the 7179 Policy. *Cf. Sutherland v. Allstate Ins. Co.*, 464 N.W.2d 150, 153 (Minn. Ct. App. 1990) (finding language that "there is no fixed date of expiration" when describing policy period indicated that the policy remained in effect "until a new policy is issued or the effective policy is cancelled"). The sequential numbering of the endorsements to the 7179 Policy, the description of the endorsements as "Policy Change[s]," and the endorsements' inclusion of "Effective Date[s] of Change" suggest that the 7179 Policy was continuing. *See Carlson Marketing Group, Inc. v. Royal Indem. Co.*, 517 F. Supp. 2d 1089, 1105 (D. Minn. 2007) (finding declarations pages that bore the same policy number and were sequentially numbered supported conclusion that renewals were continuations of existing policy rather than new policies).

However, in January 2003, Hartford sent a notice to Pioneer stating that it was "electing to non-renew" the 7179 Policy and that the termination of the 7179 Policy would be effective as of April 1, 2003. In that letter, Hartford indicated that it "may offer to replace" the 7179 Policy "with changes in the terms and conditions" including but not limited to "an increase in premium, an increase in deductibles, a reduction in limits, the addition of policy conditions and/or an elimination of certain types of coverage." The term "replace" in conjunction with the identification of the effective date of termination of the 7179 Policy indicates Hartford's intent that the 7179 Policy end on April 1, 2003, and that any commercial crime insurance policy effective after that date be a new and independent contract. This conclusion is further supported by the fact that the scope of the changes contemplated by Hartford in the January 2003 letter far exceeded the annual re-computation of the premium contemplated in the declarations of the 7179

Policy. Although Hartford described the 2003 application as a "renewal application" in its March 27 fax, the 2003 application was a full application, not a limited renewal application such as that filled out by Pioneer in 2004. The 2003 application indicated that the policy period of Pioneer's then-current commercial crime policy insurance ended April 1, 2003. When completing the 2003 application, Pioneer indicated that the effective date of coverage for the new policy began on April 1, 2003. The Court concludes that the first 7179 Policy, issued in 2000, was a continuing policy replaced in 2003 by a second 7179 Policy, which was a new and independent policy. Because the Batliner claim was made on the first 7179 Policy, and Hartford rescinded the second 7179 Policy, Hartford's rescission of the second 7179 Policy does not require Pioneer to return the $500,000.

Hartford also seeks a declaration that it is entitled to rescind the 6983 Policy, which was cancelled in 1990, and the 1130 Policy, which was cancelled in 2000. Pioneer contends that Hartford may not rescind the 6983 and 1130 Policies because they have lapsed. The parties did not make any meaningful argument or provide any authority for their respective positions on the availability of rescission for lapsed insurance policies, particularly those that lapsed years ago. Since Hartford has not demonstrated, as a matter of law, that it is entitled to rescind the lapsed Policies, the Court denies Hartford's motion for summary judgment insofar as it seeks a declaration that it is entitled to rescind those Policies and that those Policies are void *ab initio*.

The case is before the Court on Hartford's motion for summary judgment. Notwithstanding the reasoning underlying the Court's denial in part of Hartford's motion, the Court will not enter judgment at this time. The parties may file any appropriate motions on or before Friday, August 14, 2009. If no motion is brought on or before that date, the Court will dismiss Hartford's counterclaim insofar as it seeks rescission of lapsed Policies, order Hartford

to return the premiums paid by Pioneer on the second 7179 Policy, and enter judgment in this case.

## III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Hartford's Motion for Summary Judgment [Docket No. 22] is GRANTED IN PART and DENIED IN PART.

2.    Hartford is entitled to rescind the second 7179 Policy. The second 7179 Policy is void *ab initio*.

3.    Pioneer's Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

4.    If no motion is brought on or before Friday, August 14, 2009, the Court will dismiss Hartford's counterclaim insofar as it seeks rescission of lapsed Policies, order Hartford to return the premiums paid by Pioneer on the second 7179 Policy, and enter judgment in this case.

Dated:  July 22, 2009

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge